***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder and nonjoinder of parties.
3. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
4. The employment relationship existed between the employee and employer on July 24, 2002, date of the injury alleged.
5. The employer-defendant was insured with Hartford Casualty Insurance Company.
6. Plaintiff's average weekly wage was $872.69.
7. In addition, the parties stipulated into evidence the following:
1. Form 22 and wage printout.
2. Wage printout from the Conover Office.
3. Packet of stipulated pleadings.
4. Packet of stipulated medical records.
8. The Pre-Trial Agreement dated July 15, 2003, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was forty-one years old at the time of the hearing before the Deputy Commissioner and has a Bachelors of Science degree in nursing. As of July 2002, she had been employed by defendant-employer for over a year as a registered nurse. Defendant-employer was an agency which provided home health nurses as well as nurses for staff relief at hospitals and nursing homes. During the time she was employed by the company, plaintiff only worked in patients' homes. The nurses were given the option of accepting or declining any available positions, so plaintiff chose to not work in any institutional settings. She had extra qualifications in pediatric nursing and in use of ventilators. In view of her qualifications, she spent approximately half of her time working with infants and children.
2. Some time prior to March 18, 2002, plaintiff began to develop pain and a grinding sensation in her right shoulder. The symptoms worsened to the point that on March 18 she went to Dr. Whitman, an orthopedic surgeon. X-rays were ordered which showed a small spur on her acromiom, but her acromioclavicular joint otherwise appeared normal. Dr. Whitman diagnosed her with impingement syndrome and bursitis of the right shoulder. Over the next three months, he treated her with anti-inflammatory medication, cortisone injections and a period of light-duty. Her symptoms would improve after the injections but would then tend to recur. When she saw Dr. Whitman on June 12, 2002, she indicated that her shoulder was bothering her again, but she was working in her regular job at that time and the doctor did not restrict her work activities. There was a discussion regarding her participation in a clinical trial of a proposed treatment protocol for shoulder problems, but the study did not take place so plaintiff never underwent that treatment.
3. In approximately early July 2002, plaintiff took an assignment involving a quadriplegic patient who lived in Yadkinville. The patient weighed approximately 250 pounds, which made the nurses' job more difficult. In addition, his home was not well suited for use of the Hoyer lift which was required in order to move him from his bed to his chair. In view of the difficulties his situation presented, the company decided that two nurses would be required in order to move or turn him.
4. On July 24, 2002 plaintiff worked with the Yadkinville patient until 7:00 P.M. when Misty, the night nurse, came in to relieve her. Before plaintiff could leave, it was necessary for both nurses to transfer the patient from his chair to his bed. They were able to get him into the bed without difficulty but then needed to get the sling from the Hoyer lift out from under him. Using the log roll technique, plaintiff pushed the patient onto his side and Misty then held him from the other side of the bed. Normally, plaintiff would then use both hands to roll the sling up to the patient's back, but Misty was seven to eight months pregnant so plaintiff used her right hand to help support the patient's hip while she rolled up the sling with her left hand.
5. As she was rolling the sling, plaintiff suddenly experienced a popping sensation and searing pain in her right shoulder. She dropped the patient and he fell onto his back. She then left the room holding her shoulder and dropped to her knees in pain. The next day she reported her injury to her employer and was instructed to go to Prime Care for medical treatment. Consequently, on her next day off on July 27, 2002, she went to Prime Care. The doctor there instructed her to use a sling, to only do one-handed work and to follow up with Dr. Whitman. Defendants wanted her to go to another orthopedic surgeon in Greensboro, which was too far from her home in Elkin, so there was some delay before she was authorized to see Dr. Whitman. In the meantime, she returned to Prime Care for follow-up treatment and received a cortisone injection to her shoulder.
6. Dr. Whitman then examined plaintiff on August 12, 2002. Due to the severity of her symptoms, he thought that she might have torn the rotator cuff in her shoulder, so he ordered an MRI. The test showed some signs of impingement but not a rotator cuff tear, so on September 17 the doctor recommended conservative treatment. He injected her shoulder, ordered physical therapy and took her out of work completely so that she could rest the joint. Despite the medical treatment, plaintiff's shoulder remained symptomatic, so on November 9, 2002 Dr. Whitman informed her that she might require surgery. Her symptoms subsequently worsened but surgery could not be scheduled until February because defendants denied the claim and plaintiff had to obtain coverage through Medicaid since she did not have health insurance.
7. On February 7, 2003 Dr. Whitman performed arthroscopic surgery to plaintiff's right shoulder during which he found a partial tear of the anterior labrum, an injury which would have likely required sudden stress on the shoulder while it was in an abducted or flexed position. He smoothed out the tissue there as well as the inflamed bursal tissue and ground off the cupped edge of the acromiom. Following the operation, plaintiff's shoulder condition slowly but progressively improved. She went through therapy to help build up her range of motion and then her strength, but her Medicaid coverage terminated before she could complete the full program. Dr. Whitman then had her work on her exercises at home. He had not released her to return to work as of the date of hearing, but he subsequently released her on August 15, 2003 to return to work the following Monday. The evidence did not reveal whether she returned to work at that time.
8. Defendants initially paid benefits regarding this claim without prejudice pursuant to a Form 63. However, they later questioned whether plaintiff's condition was due to a new injury or whether it was a continuation of her preexisting problems. Consequently, they sent her for an independent medical examination to Dr. Ritchie, an orthopedic surgeon in Winston-Salem. He examined her on October 23, 2002 and concluded that the incident at work had at least aggravated plaintiff's condition, but he noted that she could not describe anything unusual about the event which lead to the injury. Defendants then decided to deny the claim, so plaintiff requested this hearing.
9. At the time of her injury, plaintiff was not concentrating on the specifics of her physical condition, but she was aware of weight against her hand. The fact that the patient fell back onto the bed when she withdrew her hand indicated that Misty was not holding his weight at all, as she was supposed to have been, and that his weight did come against plaintiff's arm. Plaintiff normally supported a patient in a log roll with both arms. This was an unusually heavy patient to be requiring the type of assistance the nurses were providing on this occasion. Dr. Whitman indicated that the labrum tear would normally require a sudden stress on that portion of the joint. In view of these facts, plaintiff is found to have sustained an injury by accident arising out of and in the course of her employment with defendant-employer on July 24, 2002. The fact that the weight of this very heavy patient came against one arm constituted an unusual occurrence which interrupted her regular work routine.
10. As a result of this injury by accident, plaintiff sustained a labrum tear in her right shoulder and aggravated her preexisting impingement syndrome. She was unable to work in any capacity beginning July 29, 2002. She subsequently returned to work at light-duty on a date uncertain and worked in a light duty capacity until September 6, 2002. During the period when she was working light-duty, she began to receive written reprimands for declining jobs. Before her injury, she had been free to decline jobs at will. In the three instances where she declined jobs after the injury, she had very good reasons for turning them down. In fact, it would have been unreasonable for her employer to have expected her to take two of the jobs under the circumstances. Consequently, plaintiff with justification began to suspect that her employer was setting her up to be fired. When she then made a joking comment about needing someone else present at a meeting so that she would not slap her supervisor, her employer took the opportunity to terminate her. There has been no allegation that the circumstances of her termination would meet the Seagraves standards, so no further findings are made except the finding that the circumstances did not justify the termination.
11. Plaintiff was unable to work in any capacity from September 6, 2002 until the date of hearing on July 15, 2003 and she had not been released to return to work as of the latter date. In addition, she still required medical treatment and had not reached maximum medical improvement at that time.
12. Defendants have paid compensation to plaintiff in an unknown amount in this case.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 24, 2002 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). Calderwood v.Charlotte-Mecklenburg Hospital Authority, 135 N.C. App. 112, 519
W.E.2d 61 (1999) rev. denied, 351 N.C. 351, 543 S.E.2d 124
(2000).
2. Defendants have failed to show that plaintiff was terminated for misconduct and fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily have been terminated by defendant-employer. Seagraves v. Austin Company ofGreensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996).
3. Plaintiff is entitled to temporary partial compensation at the rate of two thirds of the difference between her former average weekly wage of $872.69 and her weekly earnings while she was on light-duty which began on a date uncertain and continued until September 6, 2002, but subject to a credit in favor of defendants for compensation previously paid to her. N.C. Gen. Stat. §§ 97-30; 97-42.
4. Plaintiff is entitled to compensation for temporary total disability at the rate of $581.80 per week for the periods from July 29, 2002 until she returned to work at light-duty which began on a date uncertain and continued and from September 6, 2002 and continuing thereafter until she returns to work or until further order of the Industrial Commission. However, defendants are entitled to a credit for compensation previously paid to her for these periods. N.C. Gen. Stat. §§ 97-29; 97-42.
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary partial disability at the rate of two-thirds of the difference between her former average weekly wage of $872.69 and her weekly earnings while she was working light-duty which began on a date uncertain and continued until September 6, 2002, but subject to a credit in favor of defendants for compensation previously paid. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $581.80 per week for the periods from July 29, 2002 until she returned to work at light-duty which began on a date uncertain and from September 6, 2002 and continuing thereafter until she returns to work or until further order of the Industrial Commission, but subject to a credit in favor of defendants for compensation previously paid. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorney's fee hereinafter approved.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
4. An attorney's fee in the amount of twenty-five percent of the net compensation awarded is approved for plaintiff's counsel. Defendants shall pay her a lump sum from the accrued compensation and shall thereafter pay her every fourth check.
5. Defendants shall pay the costs.
This the 30th day of June 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DCS/mlb